Filed 2/1/21  In re Ma.A. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re Ma.A. et al., Persons Coming Under the Juvenile Court Law. | B305455 (Los Angeles County Super. Ct. No. 19CCJP07783) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>K.M.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Steff Padilla, Judge Pro Tempore. Affirmed.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] K.M. (Mother) challenges the sufficiency of the evidence supporting the jurisdictional findings against her. We affirm.

## BACKGROUND

## I. Background Regarding Family

In December 2019, when these dependency proceedings commenced, Mother lived in Los Angeles County with her children, 13-year-old Ma.A. and 11-year-old Mi.A. Mario A., the children's father (Father), lived in Georgia.

Mother and Mi.A. had moved to Los Angeles from New York in January 2019. Shortly thereafter, Ma.A., who had been living with Father in Georgia for about a year, joined Mother and Mi.A. in Los Angeles, at Mother's request.

As set forth in the December 6, 2019 Detention Report, in September 2019, the Los Angeles County Department of Children and Family Services (DCFS) received a referral about the family (not the referral that led to the filing of these dependency proceedings, which we discuss below). Ma.A., who was 12 years old at the time, called the police and reported that Mother "threatened to assault him and threatened to lock him and

_____

[1] Further statutory references are to the Welfare and Institutions Code.

2

[11-year-old Mi.A.] out of the residence because the children [were] always arguing." Mother had packed the children's things and loaded them into the car. When officers responded to the home, Mother told them "she was only doing it as a scare tactic." Mi.A., who "was scared, timid, and quiet," told the officers that Mother did "not want her and she [Mi.A.] want[ed] to be adopted." Ma.A. told the officers he wanted to go live with Father. He did not tell the officers Mother had threatened to assault him (although that is what he stated earlier when he called the police). The officers were not concerned for the children's safety, and the children "did not express any fear remaining in the home." When the officers told Mother they were going to contact DCFS, Mother "stated the children would be in Georgia before DCFS arrived." As set forth in the Detention Report, the referral received the following disposition: "Evaluated Out/path 1 community prevention linkages (parenting/conflict management)."

## II.    Current Referral and Detention

As set forth in the Detention Report, on December 3, 2019, DCFS received an expedited referral to the Child Abuse Hotline, alleging Mother physically abused 13-year-old Ma.A. at his school. This is the referral that led to the filing of these dependency proceedings.

### A.    School principal's statements

The school principal—who made the referral, and later the same day spoke with DCFS social workers—reported the following:

Thirteen-year-old Ma.A., who was in the eighth grade, came to school late, appearing to be under the influence and smelling of marijuana. The principal called Mother, who agreed

to come to the school to pick up Ma.A.  When Ma.A. learned the principal had called Mother, he began crying and said, " 'you just messed up mister, you messed up.' "

Mother arrived at the school with Ma.A.'s maternal aunt. School staff directed Mother to the office where Ma.A. was waiting.  Upon seeing Ma.A., Mother "lunged at" him and punched him repeatedly with alternating closed fists.  The chair in which Ma.A. was sitting rolled out from underneath him, and he fell to the floor.  Ma.A. curled into "a fetal position" on the floor, as Mother " 'continued to punch him.' "  The principal asked Mother to stop, but she refused.  The principal " 'grabbed her from behind and pulled her up off of' " Ma.A., as she kicked Ma.A. "all over [his] body."  Mother told the principal, " 'let go of me before I punch you.' "

School staff took Ma.A. to another room, while the principal attempted to calm Mother.  She questioned where they were taking her son and again threatened to punch the principal.  He asked her why she had reacted that way toward her son, and she responded, " 'You don't understand.  He's been lying and stealing.' "  The principal told Mother her reaction and behavior were unacceptable.  By the time school police officers arrived in the office, Mother was calm.  When Los Angeles Police Department (LAPD) officers arrived, however, Mother fled from the school, leaving the maternal aunt behind.

After the incident, the principal noticed a mark under Ma.A.'s left eye.  Ma.A. was "distraught" and told the principal repeatedly, " 'It's not going to end here.' "  The principal interpreted Ma.A.'s statements to mean Ma.A. believed Mother was going to strike him again.  The principal was concerned

4

about Mother's "violent behavior that he witnessed." The LAPD officers took Ma.A. into protective custody.

The principal told the social workers he was unaware of prior physical abuse of Ma.A. by Mother. He reported Ma.A.'s school attendance was good, but the child was "not doing too well in school." Ma.A. did not have any disciplinary issues in school until six weeks before the current incident, when Ma.A. refused to comply with the school uniform policy. The principal called Mother at that time, and she " 'brushed him off,' " asking him if he was " 'intimidated by' " Ma.A.

**B.      LAPD officer's statements**

On December 3, 2019, an LAPD officer contacted the Child Abuse Hotline to report LAPD had taken Ma.A. into protective custody based on the allegations of Mother's physical abuse summarized above. The officer also reported that Ma.A. had "visible redness and swelling underneath his left eye and complained of pain underneath his right eye."

Two DCFS social workers went to the police station. LAPD officers told them that Ma.A. said "the swelling under his eye was due to his mother kicking him in the face" during the incident at the school. The officers also said that when they asked Ma.A. if Mother had ever hit him before, Ma.A. said the only other such incident occurred three years before when Mother hit him on his buttocks with a belt "when he was in trouble."

**C.      Ma.A.'s statements**

The two DCFS social workers interviewed Ma.A. at the police station. He appeared "lethargic" and had a "red mark under his left eye." He admitted he went to school late on the day of the current referral incident because he was smoking marijuana with his friends. He said he began smoking

marijuana several months before, during the summer of 2019, "because he 'wanted to chill' as he never gets to 'chill' at home." He stated he felt "stressed out" about living in Compton with a single mother. He complained about having to babysit his 11-year-old sister Mi.A. and not having "a choice to do what he wants to do." He reported that he attended school every day, but he was "not doing well" because school was "difficult for him."

As set forth in the Detention Report, Ma.A. explained that when Mother arrived at the school that day, "she immediately started to punch him which caused him to fall to the floor, then [she] kicked him while he was in a fetal position. He didn't know how the red mark under his eye was inflicted, but reported that it was due to [Mother] hitting him. M[a.A.] stated that he couldn't do anything but to protect himself in a fetal position. He said that he is now scared to go home because he will probably be hit again when he returns home. M[a.A.] wanted [Mother] to take some time because she [was] still upset from being disappointed in him." He told the social workers he was embarrassed about "the situation" and his use of marijuana.

Ma.A. stated Mother did "not usually get as angry as she did" that day. He reported Mother had only used corporal punishment on him on one other occasion, three years before the current incident, when he lived in New York with Mother and Mi.A. He explained Mother " 'whooped' [him] when he came home late from football practice." On that occasion, Mother "socked him in the chest and hit him multiple times, all over the body, with a belt." He said the punishment did not result in any marks or bruises on his body. Mother usually disciplined him by yelling or taking away his electronic devices. Ma.A. told the social workers he knew Mother "care[d] for him and the only

6

thing he wanted to change was for [Mother] not to be disappointed in him." According to Ma.A., his younger sister Mi.A. "usually [did] not get in trouble," and he could not recall Mother using corporal punishment on Mi.A.

### D.	Mother's statements during telephone interview

The social workers called Mother to interview her about the incident. After they introduced themselves and explained why they were calling, Mother stated, " 'I don't care what happens to my son. If he wants to smoke, he can go . . . smoke. He can sit in jail and do that.' " She indicated she had other things to do. She initially refused to have a conversation with the social workers, but they were able to "de-escalat[e] the situation."

Mother stated she wanted Ma.A. "to learn his lesson" because he had been stealing from her and punching Mi.A. She expressed that she was "extremely disappointed because she is a single mother who goes above and beyond for" her children. She explained she stopped smoking marijuana (at a time not specified) when she suspected Ma.A. was smoking marijuana. She "wanted to scare him and have him incarcerated" if that would stop him from using drugs. A social worker explained to Mother that she "did not have the authority to arrest him."[2] They further explained to her that DCFS had an open referral, alleging she had "punched and kicked" Ma.A. Mother denied the allegation. She agreed to allow a social worker to come to her home to interview her and Mi.A.

_____

[2] The police officers had already informed the social workers they did not plan to arrest Ma.A. for his marijuana use. It does not appear from the record that Mother was arrested for child abuse based on the current referral incident.

7

### E. Mi.A.'s statements

Upon arriving at Mother's home, the social worker interviewed 11-year-old Mi.A. privately. Mi.A., who was in the sixth grade, expressed concerns about her grades in school and stated that she attended after school tutoring. Mi.A. told the social worker that Mother was "extremely concerned" about her and Ma.A.'s grades, "expect[ed] more" from her and Ma.A., and "was disappointed" in them. Mi.A. expressed that it upset her when Mother said, " 'I'm raising a failure,' " in "response to [her] poor grades from school."

Regarding the current referral incident, Mi.A. said "Mother informed her that she was mad at M[a.A.] and started to hit him at school." Mi.A. stated she could not recall if Mother had ever used corporal punishment on Ma.A. before this incident. According to Mi.A., Mother usually disciplined Ma.A. by taking away his cell phone. Mi.A. said she did not know if Mother would hit Ma.A. if he came home today. She added that Mother "has never been like this before."

Mi.A. reported that Mother usually disciplined her by taking away privileges. She stated the only occasion on which Mother "physically hurt" her occurred three years before in New York, when Mother "caught [her] wearing mascara" and hit her with a belt on both thighs. Mi.A. said she sustained bruises during the incident, but the "bruises went away the next day." Mi.A. denied any other incidents of corporal punishment by Mother and stated she felt safe staying with Mother.

Mi.A. further stated she had never witnessed Mother engage in a physical altercation with another adult, but she reported that Mother was arrested in December 2018 and went to court "for fighting with her ex-boyfriend" after she "caught [him]

cheating on her." Mi.A. told the social worker that while Mother was incarcerated after her arrest, Mi.A. stayed with her maternal grandmother and Ma.A. stayed with Father. Mi.A. stated that in January 2019, she and Mother moved from New York to California, and then Ma.A. "moved in with them."

F. **Mother's additional statements during the interview at her home**

At the beginning of the interview at her home, Mother continued to deny she had hit Ma.A. Later, however, she "admitted to punching and kicking" Ma.A., and she expressed remorse stating, " 'I feel bad.' " Mother told the social worker that Ma.A.'s behavior changed around two weeks before the current referral incident. According to Mother, he became " 'moody,' " he began stealing money from her, and she suspected he had stolen marijuana from the maternal aunt's purse. Mother asked him on multiple occasions if he was using marijuana. He denied it, and she trusted what he told her. She "was disappointed when she found that he disrespected her and lied to her regarding his substance use." She stated she "hit him because she wanted him to learn that this is serious." She told the social worker she "would do it again if need be." According to the social worker, "Mother went back and forth with feeling remorseful for her actions, but never fully accepted or held herself accountable for kicking and punching M[a.A.] She said that this was normal and it's not a big deal." Mother did not respond when the social worker explained "the legal terms of corporal punishment" or when the social worker told her Ma.A. "sustained a bruise on his eye" during this incident.

Mother told the social worker that in August 2019, she "threatened to kick [Ma.A. and Mi.A.] out of the home" because

they were fighting and Ma.A. punched Mi.A.[3]  Mother said she only made the threat to "scare them."  Ma.A. called the police, and officers and a social worker contacted Mother.  Mother claimed she "refused to participate" with DCFS.

Mother stated she usually disciplined the children by talking to them or taking away their cell phones.  She denied using corporal punishment.  When the social worker confronted Mother with Ma.A.'s and Mi.A.'s statements about being hit with a belt three years before, Mother admitted to each of those incidents but stated that is "not usually what she does."  The social worker also asked Mother about the incident Mi.A. disclosed involving Mother and her ex-boyfriend.  Mother acknowledged the incident and admitted it was the reason she moved to California.

Mother also acknowledged her use of marijuana and alcohol.  She stated she stopped using marijuana two days before the current referral incident because she did not want Ma.A. "to have any access or be influenced."

Mother told the social worker she would not agree to participate in any services DCFS recommended.  As for Ma.A., Mother stated she wanted him to stop smoking marijuana, to improve his grades so he could "be successful," to "have more structure," and "to be involved with a boot camp."

Mother's "housemates" (identified in the Detention Report as two females) "interjected" during the interview to tell the social worker Mother "is a protective and safe parent"; Mother

---

[3] As set forth above, DCFS reported in the Detention Report that this incident occurred in September 2019.

10

"has never been abusive and rarely raises her voice at the children"; and the children are "respectful around the house."

When the social worker informed Mother that Ma.A. was going to remain in protective custody, Mother ordered the social worker to leave her home, threatened to punch the social worker if she did not leave, and "screamed" at the social worker as the social worker walked away from the home. DCFS placed Ma.A. in a foster home.

### G. Father's statements

The social worker called Father, who was living in Georgia. Father stated Ma.A. resided with him in Georgia until February 2019. At that time, Ma.A. moved to California because Mother "wanted him to be closer to his sister." Father expressed surprise regarding the allegations against Mother. He stated Mother was "usually 'a cool person and she's level headed.'" He said the children had not disclosed any corporal punishment by Mother. He told the social worker that he would pay for Ma.A. to return to Georgia to live with him.

According to the social worker, Mother believed Ma.A. would "be better suited in Georgia," and she wanted "nothing to do with him."

## III. Dependency Petition and Detention Hearing

On December 5, 2019, DCFS filed a dependency petition under section 300, subdivisions (a), (b), and (j), alleging Mother's physical abuse of Ma.A. placed Ma.A. and Mi.A. "at risk of serious physical harm, damage, and physical abuse."[4] DCFS

---

[4] The petition also included an allegation under section 300, subdivision (b), regarding Mother's marijuana and alcohol use. The juvenile court later dismissed that allegation at the adjudication hearing. Thus, we have not summarized herein all

11

recommended Ma.A. remain in foster care and Mi.A. remain in Mother's home under court supervision.

At the December 6, 2019 detention hearing, the juvenile court found DCFS made a prima facie showing that Ma.A. and Mi.A. were persons described by section 300. Mother and the children's counsel agreed with DCFS's recommendation that Ma.A. remain detained in foster care and Mi.A. remain released to Mother, and the court so ordered. The court also ordered, with Mother's agreement, that DCFS assess Father's home for placement of Ma.A. The children's counsel wanted Mother to participate in services as a condition for Mi.A. remaining in her care. The court commented on "how serious" the allegations against Mother were and ordered DCFS to provide Mother with referrals for parenting, domestic violence, and anger management classes, Al-Anon, family counseling, and individual counseling. The court ordered monitored visitation for Mother and Ma.A. and ordered Mother not to use corporal punishment on Mi.A.

Regarding the current incident of physical abuse, Mother's counsel commented at the detention hearing: "My client is a single mother. She has a job, and she lost control. I think she felt very betrayed by her son. They have a close bond. He lied to her. He was doing something that he wasn't supposed to do. She lost control, made a big mistake, and she recognizes that and is remorseful."

---

the witness statements regarding Mother's marijuana and alcohol use.

## IV. Jurisdiction/Disposition Report
### A. Mother's statements

As set forth in the February 10, 2020 Jurisdiction/Disposition Report, a DCFS dependency investigator interviewed Mother at her home on January 27, 2020. Regarding the allegations of physical abuse, Mother stated, in pertinent part: " 'I didn't do it to physically abuse him, just to put fear in him. I went to the school and smacked him in the head a few times. I didn't push him down[,] we actually tripped over his backpack [and] fell. I didn't kick him in the face as indicated in the other report. My son is 5'11["] and he is bigger than me. I have to admit, I was upset because I asked him several times and I gave [him] several opportunities to be honest with me. I take accountability for what I did and I was upset and disappointed. I asked him about weed for the past two weeks. This is not how I usually discipline him. I usually take away his electronics. I did whoop him when he was like five or six years old with a belt because he peed on his sister. I haven't hit him since then, until now. I feel like my son is very spoiled and manipulative. He is not afraid of me and he has told me multiple times that he wants to come home. At this point, I just want him to go live with his dad; he listens to him. I should have never let [him] come here to California; he should have stayed with his dad.' "

Mother stated she wanted to reunify with Ma.A., and DCFS recommended reunification services for her. Mother told the investigator, however, that she could not participate in court-ordered services because she worked Monday through Friday from 8:00 a.m. to 5:00 p.m. at a job she had held for about a month, and she attended nursing school from 6:00 to 10:00 p.m.

The investigator also interviewed Mi.A. on January 27, 2020 at Mother's home. Mi.A.'s statements were consistent with what she told the social worker at the time of detention, as summarized above.

**B.     Ma.A.'s statements**

The DCFS dependency investigator interviewed Ma.A. at his foster home on January 28, 2020. Regarding the allegations of physical abuse, he stated, in pertinent part: " 'The school called my mom and she came up to the school and she hit me and I fell on the floor and then she kicked me in the eye. This was the first time she acted like this. I mean she is my mom so I wasn't going to hit her back[,] I was just trying to block her from hitting me. My mom usually takes away our electronics, my cell phone or she yells at us. She has hit me with a belt before all over my body because I was late coming home from football practice about three years ago when we lived in New York. I didn't have any bruises. My sister doesn't really get into trouble, so my mom doesn't hit her. My mom did ask me a lot of times if I was smoking weed and I told her no. She was mad that I lied to her. It's not that I am afraid of my mom, I just wanted her to chill out and I felt like we need time apart. I would go home, but I like it here (referring to foster care).' " Ma.A. described his foster home as " 'chill,' " and said he could "do whatever he want[ed] to do" there.

**C.     Foster mother's statements**

The dependency investigator also interviewed Ma.A.'s foster mother on January 28, 2020. She stated she was aware Ma.A. was still smoking marijuana, based on his red eyes and his odor. She found "a vapor devise" in his backpack. She further told the investigator that he stole money from her purse, and he

14

also took her "air pods," which " 'magically reappeared' " after she threatened to call the police.

The foster mother said she heard Ma.A. yell at Mother, and it did not appear to her that Ma.A. was afraid of Mother. The foster mother went to the movies with Ma.A. and Mother, and she observed that Mother "appears to be M[a.A.]'s friend instead of his mother," and Ma.A. "controls [Mother] and she does whatever he says/demands." The foster mother also commented that Ma.A. "has anger problems and when he can't have his way he gets angry and starts yelling and using foul language."

## V.      Adjudication/Disposition Hearing

### A.      Mother's testimony

At the February 19, 2020 adjudication/disposition hearing, after the juvenile court admitted DCFS's reports into evidence, Mother testified. She stated she had not had any difficulty parenting either of her children in the past few months. When her counsel asked her what happened at Ma.A.'s school on December 3, 2019, Mother responded, "Basically M[a.A.] was in the principal['s] office and I reacted to the situation." She did not elaborate regarding what occurred. She stated she felt "bad" about the way she reacted, and she also "felt betrayed a little." She "let [her] emotions and [her] frustration get the best of [her]," and "normally that doesn't happen." She added: "[N]ormally I have a strong mind frame, and I don't really let my emotions get the best of me. Like I just don't know what happened. So I just apologize for what happened basically." She denied an incident like this had ever happened before.

Mother stated she could not recall the last time she used physical discipline on Ma.A., but she knew it was more than three years ago. She denied ever hitting either of her children

with a belt. In describing how she usually disciplined her children, Mother testified: "We just talk. Like I let them know you know what's right and what's wrong, try to come up with an understanding."

Mother's counsel asked her how she could make sure what happened on December 3, 2019 "doesn't happen again." Mother responded: "I mean obviously I know the consequences. So it won't happen again." Mother stated she had a good relationship with Ma.A., and she did not believe the incident had affected that relationship.

On cross-examination by DCFS's counsel, Mother denied she hit or kicked Ma.A. at his school on December 3, 2019. Later in her testimony, she stated she "smacked him" in the back of his head, and he fell. She also denied that Ma.A. curled up in a fetal position and that the principal pulled her off him. She stated she (Mother) tripped over Ma.A.'s book bag and then stood up on her own.

## B.    Jurisdictional findings

The juvenile court heard oral argument on jurisdiction. DCFS's counsel and the children's counsel urged the court to sustain the allegations regarding Mother's physical abuse of Ma.A. Mother's counsel asked the court to dismiss the allegations, arguing this was "an isolated incident," that "was disciplinary in nature" and for which Mother felt remorse, and there was no reason to believe another incident would occur in the future.

The juvenile court sustained allegations a-1 and j-1 as follows: "On 12/3/19, [Mother] physically abused [Ma.A.] by repeatedly striking and kicking the child's body, resulting in the child sustaining a mark on the child's eye. On a prior occasion,

[Mother] struck the child's buttocks with a belt.  The child is afraid of [Mother] and refuses to return to the care of [Mother].  Such physical abuse was excessive and caused the child unreasonable pain and suffering.  The physical abuse of the child by [Mother] endangers the child's physical health, safety and well-being, creates a detrimental home environment and places the child and the child's sibling, [Mi.A.], at risk of serious physical harm, damage, and physical abuse."[5]

In sustaining the allegations, the juvenile court commented:  "But to walk into a school and coldcock your son and hit him in the eye and hurt him, that's not [merely] inappropriate physical discipline.  That's an assault and then, when he's on the ground, to kick him, according to the reports, and to say -- to do it in public in a school place is -- is shocking, not unheard of unfortunately.  [¶]  And here's the thing:  The minor knew you were going to overreact.  Why?  Because the first thing he said when he found out you had been called, oh, mister, you done messed up.  And he was right."  The court also referenced Mother's "lack of insight" regarding her conduct.

### C.    Disposition

The juvenile court declared Ma.A. and Mi.A. dependents of the court, removing Ma.A. from Mother and ordering him placed with Father in Georgia (based on the assessment of Father's

---

[5] The juvenile court dismissed an identical allegation under section 300, subdivision (b), and also dismissed the allegation regarding Mother's marijuana and alcohol use.

home), and ordering Mi.A. to remain in Mother's home. The court ordered Mother to complete a case plan.[6]

## DISCUSSION

Mother contends there is insufficient evidence to support jurisdictional findings a-1 and j-1 against her, quoted above.

"In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

Jurisdiction under section 300, subdivision (a), is appropriate where the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical

---

[6] We do not summarize the components of Mother's case plan because Mother does not challenge any portion of the case plan on appeal.

18

harm.  For purposes of this subdivision, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury." (§ 300, subd. (a).)

"While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, abrogated in part on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 627-629.)  "A juvenile court need not wait until a child is seriously abused or injured before it takes jurisdiction under section 300, subdivision (a)." (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 138.)

Jurisdiction under section 300, subdivision (j) requires a finding the "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions.  The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).)

Substantial evidence in the record demonstrates that at the time of the adjudication hearing Ma.A. and Mi.A. were at substantial risk of suffering serious physical harm inflicted nonaccidentally upon them by Mother.  The evidence shows Mother attacked Ma.A. in a public space—a school.  In front of school staff, Mother repeatedly punched Ma.A. with alternating closed fists, and when he fell to the ground and curled into a fetal

position to protect himself, Mother kicked him all over his body, including his face. It was fortunate that Ma.A. only suffered redness, swelling, and bruising under his eye. There is no doubt that punching and kicking someone all over the body, including the face, may result in serious physical injury. The assault on Ma.A. only ended when the principal pulled Mother off Ma.A. After the incident, Ma.A. told social workers he was afraid to go home to Mother because he believed she would hit him again. Mother told a social worker she "would do it again if need be" (what she did to Ma.A. on December 3, 2019) to teach Ma.A. a lesson if he misbehaved again.

Even at the adjudication hearing, Mother continued to downplay the incident, denying she punched or kicked Ma.A. Based on substantial evidence in the record, the juvenile court did not find Mother's denials to be credible, and we may not disturb the juvenile court's credibility findings on appeal.

Mother testified at the adjudication hearing that this was an isolated incident and usually she did not let her emotions get the best of her. Substantial evidence in the record shows otherwise. Mother threatened to punch both the school principal and a social worker in connection with this incident. She was arrested a year before this incident for engaging in a physical altercation with her ex-boyfriend. She had used a belt to discipline both Ma.A. and Mi.A. in the past, inflicting bruises on Mi.A.

Mother had not participated in any services to address her anger or her parenting and, in fact, she had expressed a refusal to participate in such services. Her lack of engagement in services, coupled with her failure to understand the seriousness of her public attack on Ma.A. and her history of engaging in

violent conduct and threatening violent conduct demonstrate her children were at substantial risk of suffering serious physical harm inflicted nonaccidentally upon them by her.

Mother argues on appeal that Mi.A. was not at substantial risk of serious physical harm inflicted nonaccidentally because she "was not a young child unable to protect herself; she was a pre-teen and did not get into trouble." Ma.A. was a 5'11" teenager who was attacked by Mother with closed fists and kicks to the face in the presence of school staff. That Mi.A. was at risk of being disciplined in the same manner Ma.A. had been disciplined, is evidenced by the fact Mother struck both of them with belts in the past for infractions (Ma.A. for coming home late from football practice at around age 10, and Mi.A. for wearing mascara at around age eight). There was a substantial risk Mi.A. would misbehave, as children do, and Mother would "let her emotions get the best of her" and discipline Mi.A. in the same manner she disciplined Ma.A. on December 3, 2019, given Mother's lack of understanding of the seriousness of her attack on Ma.A. and her failure as of the date of the adjudication hearing to participate in services to address her issues.

Substantial evidence supports the juvenile court's jurisdiction under section 300, subdivisions (a) and (j).

## DISPOSITION

The jurisdictional findings and disposition orders are affirmed.

NOT TO BE PUBLISHED


                                        CHANEY, J.


We concur:



        BENDIX, Acting P. J.



        FEDERMAN, J.*

_____

        * Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.